UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MASTER DOCKET NO. 08-MDL-1888-GRAHAM/O'SULLIVAN

IN RE MARINE HOSE ANTITRUST
LITIGATION

THIS DOCUMENT RELATES TO:

SHIPYARD SUPPLY, LLC, ET AL.,

        Plaintiffs,

vs.

BRYAN ALLISON, ET AL.,

        Defendants.

Case No. 07-CIV-21592
GRAHAM/O'SULLIVAN

WEEKS MARINE, INC., ET AL.,

        Plaintiffs,

vs.

BRIDGESTONE CORP., ET AL.,

        Defendants.

Case No. 08-CIV-20754
GRAHAM/O'SULLIVAN

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT JACQUES COGNARD'S MOTIONS TO
DISMISS FOR LACK OF SERVICE AND PERSONAL JURISDICTION

Plaintiffs Shipyard Supply, LLC ("Shipyard Supply") and Weeks Marine, Inc. ("Weeks Marine")[1] submit this memorandum in opposition to the motions (Dkt. Nos. 102-1, 104-1)[2] of Defendant Jacques Cognard ("Cognard ") to quash summons and dismiss the Consolidated Class Action Complaint ("Consolidated Complaint" or "Cons. Compl.") with prejudice,[3] for lack of service of process as to Weeks Marine and Shipyard Supply, and for lack of personal jurisdiction as to Weeks Marine, pursuant to Fed. R. Civ. P. 4(m), 12(b)(2), 12(b)(5) and 41(b).[4]

## INTRODUCTION

Under Federal Rule of Civil Procedure 4(m), a plaintiff has 120 days to serve a defendant from the date that the complaint is filed with the court. Fed. R. Civ. P. 4(m). Plaintiffs, including Weeks Marine and Shipyard Supply, filed their Consolidated Complaint on March 24, 2008, and have until July 22, 2008 to serve their Consolidated Complaint upon Cognard.

Not only has the time for service of the Consolidated Complaint not run, but this Court also has personal jurisdiction over Cognard, because he consented to such by filing an Answer to the Consolidated Complaint, and because the Southern District of New York, where Weeks Marine filed his initial action, had personal jurisdiction over Cognard. For the reasons stated below, Cognard's motions should be denied.

---

[1] Collectively, with Bayside Rubber & Products, Inc. ("Bayside Rubber") and Expro Gulf Limited, "Plaintiffs."

[2] Unless otherwise noted, all cites to filings are to the MDL Docket, *In re Marine Hose Antitrust Litig.*, Case No. 08-01888.

[3] Defendant Cognard does not argue for dismissal of the Consolidated Complaint with prejudice, or for lack of personal jurisdiction, as to any Plaintiffs other than Weeks Marine. In fact, in his Answer to the Consolidated Complaint as to Plaintiff Bayside Rubber, Cognard stated that he "does not contest personal jurisdiction in the Southern District of Florida." (Answer, Dkt. #103).

[4] Plaintiffs herein oppose the following motions of Cognard: Motion to Dismiss For Lack of Service, as to Shipyard Supply ("Shipyard Supply Mem.," Dkt. No. 102-1), and Motion to Dismiss for Lack of Service and Personal Jurisdiction, as to Weeks Marine ("Weeks Marine Mem.," Dkt. No. 104-1).

2

## STATEMENT OF FACTS / PROCEDURAL BACKGROUND

This class action seeks redress for those entities who have paid artificially-inflated prices for marine hose[5] as a result of an unlawful, long-running and carefully-organized conspiracy to secretly inflate the price of these products by fixing prices, allocating markets and rigging bids. The conspiracy involved ten corporations, including Trelleborg Industrie S.A. ("Trelleborg"), and ten officers and employees of these companies, including Cognard.[6] Cognard, Oil and Marine Manager for Trelleborg, played an integral role in the conspiracy and participated in at least three conspiratorial meetings, including one within this district, with at least five other co-conspirators in December 2000, June 2001 and July 2002. (Cons. Compl. at ¶¶ 27, 56 – 58).

The conspiracy was exposed on May 2, 2007, when U.S. antitrust authorities announced that they had arrested and filed criminal complaints against eight marine hose executives, including Cognard, for criminal violations of Section 1 of the Sherman Act, based upon information obtained from co-conspirator Yokohama.[7] (Cons. Compl. at ¶¶ 63 – 64). American, British, European, and Japanese antitrust authorities also executed coordinated searches of the

---

[5] As defined in the Complaint, "marine hose" is a flexible rubber hose in various diameters and lengths, and include related products used in conjunction with marine hose, which are primarily used to transport oil and other fluids between offshore tankers and other tankers, storage facilities and buoys. (Cons. Compl. at ¶ 8).

[6] The co-conspirators included the following companies (collectively, "Entity Defendants"): Defendants Parker ITR and Parker Hannifin (collectively, Parker), Bridgestone America and Bridgestone Corporation ("Bridgestone Japan") (collectively, "Bridgestone"), Trelleborg Industrie S.A. ("Trelleborg"), Manuli Rubber Industries SpA and Manuli Oil & Marine (U.S.A.) Inc. (collectively, "Manuli"), Dunlop Oil & Marine Ltd. ("Dunlop"), Yokohama Rubber Co., Ltd. ("Yokohama") and PW Consulting (Oil and Marine) Ltd. ("PW Consulting"). (Cons. Compl. at ¶¶ 14 – 33). The conspiracy also involved the following individuals (collectively, "Individual Defendants"): Peter Whittle ("Whittle"), David Brammar ("Brammar"), Bryan Allison ("Allison"), Jacques Cognard ("Cognard"), Christian Caleca ("Caleca"), Misao Hioki ("Hioki"), Francesco Scaglia ("Scaglia"), Vanni Scodeggio ("Scodeggio"), Val Northcutt ("Northcutt") and Uwe Bangert ("Bangert"). (*Id.* at ¶¶ 24 – 33).

[7] In November and December 2007, Cognard and four other Defendants (Caleca, Allison, Brammar and Whittle) pleaded guilty to Section 1 violations, and three of them (Allison, Brammar and Whittle) face similar charges in the United Kingdom. (*Id.* at ¶¶ 71, 72).

offices of the cartel members around this time. (*Id.* at ¶ 66). In February 2008, the Japan Fair Trade Commission issued a cease and desist order against Trelleborg as well as four other Defendants (Bridgestone, Dunlop, Parker and Manuli) to halt anti-competitive practices regarding marine hose. (*Id.* at ¶ 74).

As the affidavits in support of the criminal complaints revealed, cartel members paid Whittle approximately $300,000 annually to coordinate their anticompetitive scheme. (*Id.* at ¶ 51). Cartel members first agreed on the prices that they would charge for marine hose and the allocated market share of each member. (*Id.* at ¶¶ 51, 52, 53, 55 – 62). Cartel members then provided Whittle information about upcoming marine hose contract bids and Whittle designated the conspirator who "won" each bid, in a manner consistent with the previously agreed-upon market allocation.[8] (*Id.* at ¶ 51). Whittle calculated the amount that the other cartel members should offer to ensure that the "champion" won each bid. (*Id.*). Needless to say, this scheme ensured that the price ultimately paid for marine hose was higher than would have prevailed in a competitive market. (*Id.* at ¶¶ 2, 76). Cartel members sold and shipped substantial quantities of marine hose while the conspiracy was ongoing. (*Id.* at ¶ 39).

The co-conspirators met on a regular basis over the years to implement and run their illegal scheme. Cognard participated in at least three cartel meetings between 2000 and 2007 (*Id.* at ¶¶ 55 – 62): a December 2000 meeting in Bangkok, Thailand (*Id.* at ¶ 56); a June 2001 meeting in Key Largo, Florida (*Id.* at ¶ 57); and a July 2002 meeting in London, England (*Id.* at ¶ 58).[9] At these meetings, Cognard and the cartel members discussed price lists for marine hose

---

[8] Cartel members used the code word "champion" to refer to the purported "winner" of the rigged bidding. (*Id.* at ¶ 51).

[9] The final meeting of the cartel occurred on May 1, 2007 in Houston, Texas, coinciding with the attendance by a number of the Individual Defendants at the Offshore Technology Conference, a trade symposium for the ocean resources industry. (*Id.* at ¶ 61).

and allocation of market share and bid-rigging for such products. (*Id.* at ¶¶ 53, 55 – 58). In addition to these meetings, cartel members exchanged numerous phone calls and emails between and among themselves, continuing their efforts to manage the conspiracy through instructions on fixing prices, rigging bids and allocating customers. (*Id.* at ¶ 59).

These illegal meetings and communications were, not surprisingly, held in secret so that the conspiratorial activities would not be discovered and that cartel members could continue to falsely hold themselves out to the public as true competitors. (*Id.* at ¶ 77). In addition, cartel members took well thought-out and coordinated steps to conceal the conspiracy from both government regulators and the public. (*Id.* at ¶ 77 – 79). For example, in written communications, the conspirators referred to the cartel by the code names "Technical Committee – Marine Hose" and "the club." (*Id.* at ¶ 54). Similarly, cartel members used code designations to refer to each other – *e.g.*, Dunlop was designated "B1" and Trelleborg was designated as "B2." (*Id.*). Because of these secretive measures, the co-conspirators were able to conceal their illegal activities until the arrests. (*Id.* at ¶ 77).

Following news of these arrests, Plaintiffs promptly filed suit. Shipyard Supply filed its initial complaint in this Court on June 21, 2007. (Dkt. No. 1, Case No. 07-21592, Exhibit 1 to Shipyard Supply Mem.). Weeks Marine filed its initial complaint in the Southern District of New York on July 27, 2007. (Dkt. No. 1, SDNY Docket, Exhibit 1 to Weeks Marine Mem.). On January 23, 2008, the Judicial Panel for Multidistrict Litigation issued a Transfer Order, designating this Court as the appropriate court to handle the marine hose antitrust multidistrict litigation, and transferring Weeks Marine's case to this Court. On March 24, 2008, Plaintiffs, including Shipyard Supply and Weeks Marine, filed the Consolidated Complaint. On May 5, 2008, Cognard filed an Answer to the Consolidated Complaint as to Bayside Rubber. (Answer,

Dkt. # 103). In his Answer, Cognard stated that he "does not contest personal jurisdiction in the Southern District of Florida." (*Id.*). Cognard now seeks dismissal of the Consolidated Complaint, in part, for lack of personal jurisdiction.

## ARGUMENT

### I. The Period For Service of The Consolidated Complaint Has Not Lapsed

Cognard contends that this Court should quash the summons and dismiss the Consolidated Complaint for lack of service of process. (Weeks Marine Mem. at 3-4; Shipyard Supply Mem. at 3).[10] Under Federal Rule of Civil Procedure 4(m), Plaintiffs, including Weeks Marine and Shipyard Supply, have 120 days from the date that the Consolidated Complaint was filed to serve Cognard. Fed. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action *without prejudice* against that defendant or order that service be made within a specified time" (emphasis added)). Plaintiffs filed their Consolidated Complaint on March 24, 2008. Accordingly, they have until July 22, 2008 to serve the Consolidated Complaint upon Cognard.[11]

---

[10] Bayside Rubber filed its initial complaint in this Court on July 12, 2007, and served Cognard on July 14, 2007. (Dkt. No. 1, Case No. 07-21797).

[11] Even if these cases had not been consolidated for pretrial purposes and Cognard sought to quash service of the initial complaints filed by Weeks Marine and Shipyard Supply, this Court should have extended the time for service, since Plaintiffs had a good faith basis for not serving Cognard sooner. Fed. R. Civ. P. 4(m) ("if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1343 (S.D. Fla. 1999) ("even if Gluck were improperly served, good cause exists for any delay in service, and it is apparent the Gluck was not prejudiced in anyway by the delay"). Plaintiffs made numerous attempts to serve their initial complaints upon Cognard, but were unsuccessful. *See* November 21, 2007 letter from Seth R. Gassman to the Honorable Alvin K. Hellerstein, p. 2 (Exhibit A to the Declaration of Gregory Asciolla in Support of Plaintiffs' Opposition to Defendant Jacques Cognard's Motions to Dismiss for Lack of Service And Personal Jurisdiction ("Asciolla Decl.")).

## II. This Court Has Personal Jurisdiction Over Cognard

Despite Cognard's protests (Weeks Marine Mem. at 4-7), this Court has personal jurisdiction over him for two reasons. Cognard consented to the personal jurisdiction of this Court by filing an Answer to the Consolidated Complaint. Furthermore, this Court has personal jurisdiction over Cognard because the Southern District of New York had personal jurisdiction over Cognard under the New York long-arm statute.

### A. Cognard Consented to Personal Jurisdiction

Cognard filed pleadings in this Court stating that he does not contest personal jurisdiction in Florida. In his Answer to the Consolidated Complaint as to Bayside Rubber, Cognard stated that he "does not contest personal jurisdiction in the Southern District of Florida." (Answer, Dkt. # 103). Since the essence of the concept of "personal jurisdiction" is a court's power over a particular defendant, and not a particular claim, Cognard's consent to personal jurisdiction in Florida applies to all claims that have been consolidated here in Florida. *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990) ("Objections to service of process, however, like any other objection to jurisdiction over the person, can be waived by the party over whom jurisdiction is sought"). Thus, Cognard's recitation of the general rule that "a transferee court may exercise personal jurisdiction over a defendant only to the extent that the transferor court could" (Weeks Marine Mem. at 4) is unavailing, since Cognard waived any and all objections to personal jurisdiction by consenting in his Answer to personal jurisdiction of this Court.

### B. Jurisdiction is Proper Under New York's Long-Arm Statute

Even if Cognard's consent to jurisdiction in Florida is not dispositive of the personal jurisdiction issue, and the court deems it necessary to examine whether Cognard would have been subject to personal jurisdiction in New York, Cognard is subject to personal jurisdiction

under New York's long-arm statute, N.Y.C.P.L.R. § 302(a). Despite Cognard's assertions to the contrary, New York courts recognize that conspirators in an antitrust scheme may be subject to personal jurisdiction in New York under Sections 302(a)(2) and 302(a)(3) of the long-arm statute. *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 230-52 (W.D.N.Y. 1997).[12]

Under Section 302(a)(2) of New York's long arm statute, jurisdiction is proper over a non-resident defendant when he or she "commits a tortious act within the state." N.Y.C.P.L.R § 302(a)(2). To sustain Section 302(a)(2) jurisdiction, a defendant need not be physically present in New York in order to commit the required tortious act. *Daniel*, 988 F. Supp 127 at 231 (citing *Pilates, Inc. v. Pilates Institute, Inc.*, 891 F. Supp. 175, 180 (S.D.N.Y. 1995)). To establish jurisdiction under Section 302(a)(2) on the basis of conspiratorial acts, plaintiffs must make a factual showing of a conspiracy, allege sufficient facts warranting that the defendant was a member of the conspiracy, and show that a tort arising from the conspiracy was committed in New York. *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991). When a person who has been injured by a violation of the antitrust laws sues for damages, the tort is the injury flowing from the conspiracy, not the conspiracy itself.[13] *Daniel*,

---

[12] Cognard's reliance on *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005) and *GTE New Media Servs. Inc. v. Bellsouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) is misplaced, as these courts merely hold that plaintiffs may not rely on the nationwide service of process provision found in Section 12 of the Clayton Act to establish personal jurisdiction where venue under Section 12 of the Clayton Act is not proper. In an earlier decision in *Daniel*, cited above, the district court held that Sections 302(a)(2) and/or 302(a)(3) of the New York long-arm statute may be used to support personal jurisdiction in antitrust conspiracy cases. *Daniel*, 988 F. Supp. at 230-52. Although the district court in the first *Daniel* decision relied on the nationwide service of process statute to establish personal jurisdiction over the defendants, it nonetheless recognized that participation in an antitrust conspiracy could support jurisdiction under Section 302(a)(2) and 302(a)(3) of New York's long-arm statute. In the *Daniel* decision cited by Cognard, the Second Circuit spoke only to the use of Section 12 of the Clayton Act to establish personal jurisdiction. Accordingly, the antitrust conspiracy theory of jurisdiction remains a viable means of satisfying the New York long-arm statute.

[13] An action alleging violations of antitrust laws is considered a claim for injuries sustained in New York, and thus is in the nature of a tort supporting long-arm jurisdiction under Section 302(a)(2) of the long arm statute. *Daniel*, 988 F. Supp. at 231-32; *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264

988 F. Supp. at 231-32; *Albert Levine Assocs. v. Bertoni & Cotti, S.p.A.*, 314 F. Supp. 169, 171 (S.D.N.Y. 1970). The claim, therefore, arises where the plaintiff suffered injury. *Id.* Thus, if plaintiffs suffered antitrust injuries in New York as a result of the conspiratorial acts, the injury occurring in New York is sufficient to meet the requirement that a tortious act take place in New York under Section 302(a)(2). *Daniel*, 988 F. Supp. at 232.

Here, the Consolidated Complaint alleges sufficient facts to establish personal jurisdiction over Cognard, based upon his participation in the conspiracy. The Class, defined as "[a]ll persons and entities . . . who purchased Marine Hose in the United States" (Consol. Compl. at ¶ 40), necessarily includes persons and entities who purchased such products in New York. These class members suffered an economic injury in New York in that the price that they paid for marine hose was artificially fixed, raised, maintained, or stabilized to anticompetitive levels as a result of the conspiracy. Since the locus of the tort in an antitrust conspiracy is the locus of the injury, the tort was committed in every state where marine hose was purchased, including New York. As such, jurisdiction over Cognard pursuant to Section 302(a)(2) of New York's long-arm statute is proper.

This Court also has jurisdiction under Section 302(a)(3) of the New York long-arm statute. Section 302(a)(3) of the New York long arm statute provides for jurisdiction over a nondomiciliary where he or she (1) commits a tortious act outside the state of New York that causes injury to a person or property inside the state, and (2) either (a) regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or services rendered in the state, or (b) expects or should reasonably expect the

---

(1946) (antitrust violations are essentially tortious acts); *Rios v. Marshall*, 530 F. Supp. 351, 367 n.16 (S.D.N.Y. 1981) (an antitrust violation is characterized as a tortious act for purposes of personal jurisdiction).

act to have consequences in the state and derives substantial revenue from interstate or international commerce. N.Y.C.P.L.R. § 302(a)(3). New York recognizes that an antitrust violation is a tortious act for purposes of personal jurisdiction. *Rios*, 530 F. Supp. at 367 n.16; *Albert Levine Assocs.*, 314 F. Supp. at 171. As previously stated, the Class includes persons and entities who purchased marine hose in New York, and who have thereby suffered injury in New York as a result of Cognard's conduct. Furthermore, Cognard's substantive participation in a scheme to fix prices "throughout the United States" is such that he should reasonably expect this act to have consequences in every state in the nation, including New York. As such, jurisdiction over Cognard is proper under Section 302(a)(3) of the New York long arm statute.

### C. The Exercise of Jurisdiction Would Not Offend Due Process

Once the long-arm statute has been deemed satisfied, the inquiry becomes one of determining whether the defendant's actions satisfy the minimum contacts required by due process such that the assertion of jurisdiction would not offend traditional notions of fair play and substantial justice. Actual physical contacts are not required in order for a court to properly exercise jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). The Court must be assured that defendant's contacts with the forum "are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In New York, satisfaction of the requirements of Section 302 of the long-arm statute satisfies federal due process requirements because the scope of jurisdiction under Section 302 does not extend as far as the U.S. Constitution permits. *JFP Touring, LLC v. Polk Theatre, Inc.*, Case. No. 07-cv-3341, 2007 U.S. Dist. LEXIS 51388, at *33 (S.D.N.Y. July 9, 2007) (noting that if jurisdiction is proper under the C.P.L.R., due process will be satisfied); *Cyberscan Tech., Inc. v. Sema Ltd.*, Case No. 06-civ-526, 2006 U.S. Dist. LEXIS 90375, at *17 (S.D.N.Y.

Dec. 13, 2006); *Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GH & Co.,* 150 F. Supp. 2d 566, 572 (S.D.N.Y. 2001). As such, since the requirements of Section 302(a)(2) and 302(a)(3) are satisfied, due process concerns are likewise satisfied.

Several other courts have held that due process is not offended when personal jurisdiction is extended to participants in antitrust conspiracies to fix prices in the United States. *Execu-Tech Bus. Sys. v. New Oji Paper Co.,* 752 So. 2d 582, 584 (Fla. 2000) (holding that Florida courts had personal jurisdiction over Japanese company who conspired to fix prices of facsimile paper throughout the United States); *In re Auto. Refinishing Paint Antitrust Litig.,* 229 F.R.D. 482, 493-94 (E.D. Pa. 2005) (holding that federal district court had jurisdiction over Belgian defendant who participated in an antitrust price fixing scheme); *accord Remmes v. Int'l Flavors & Fragrances, Inc.,* 389 F. Supp. 2d 1080, 1094-95 (N.D. Iowa 2005) (the "majority" of federal courts which have considered the matter have "concluded that jurisdiction based on the conspiracy theory does not violate due process") (collecting cases).

## CONCLUSION

For all the foregoing reasons, this Court should deny Defendant Cognard's motions to quash service and for dismissal of the Consolidated Class Action Complaint ("Consolidated Complaint") with prejudice (as to Weeks Marine), for lack of service of process as to Weeks Marine and Shipyard Supply, and for lack of personal jurisdiction as to Weeks Marine.[14]

---

[14] Even if this Court were to dismiss the Consolidated Complaint as to Weeks Marine and Shipyard Supply, it should be *without* prejudice. Fed. R. Civ. P. 4(m) (any dismissals for lack of service within 120 days must be *"without prejudice"* (emphasis added)); *Turner v. United States,* 203 Fed. Appx. 952, 954 (11th Cir. 2006) ("dismissal with prejudice is a drastic sanction that may be imposed only upon finding a clear pattern of delay or willful contempt *and* that lesser sanctions would not suffice"). Defendant Cognard provides no sound basis for dismissal with prejudice (as to Weeks Marine) or the award of attorneys' fees, expenses, costs and interest. (Weeks Marine Mem. at 7; Shipyard Supply Mem. at 4).

11

Dated: May 22, 2008

Respectfully submitted,

   /s/ Hollis L. Salzman
Hollis L. Salzman
Florida Bar No. 947751
Gregory S. Asciolla
Vicky Ku
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
hsalzman@labaton.com
gasciolla@labaton.com
vku@labaton.com

Gregory P. Hansel
Florida Bar No. 607101
Randall B. Weill
PRETI, FLAHERTY, BELIVEAU &
PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
Facsimile: (207) 791-3111
ghansel@preti.com
rweill@preti.com

Bruce Gerstein
Kevin Landau
Jan Bartelli
GARWIN GERSTEIN & FISHER L.L.P.
1501 Broadway, Suite 1416
New York, NY 10036
Telephone: (212) 398-0055
Facsimile: (212) 764-6620
bgerstein@garwingerstein.com
klandau@garwingerstein.com
jbartelli@garwingerstein.com

*Co-Lead Counsel for Plaintiffs*